CLERK'S OFFICE U.S. DISTRICT COURT
AT ABINGDON, VA
FILED

JUL 24 2024

LAURA A. AUSTIN, CLERK
BY: /s/ J. Clark
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:24CR22 |
| v. | Violations: |
| BRYCE CLEVELAND | 18 U.S.C. § 1341<br>Mail Fraud |
| Defendant. | 18 U.S.C. § 1343<br>Wire Fraud |
| | 21 U.S.C. §§ 331(a), 351(f)(1)(B), 360c(f)(1), and 333(a)(2))<br>Introduction of Adulterated Devices into Interstate Commerce |
| | 21 U.S.C. §§ 331(d), 355(a), and 333(a)(2)<br>Introduction of an Unapproved New Drug into Interstate Commerce |
| | Forfeiture Notice |

## INDICTMENT

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

#### *DEFENDANT*

1. Defendant **BRYCE CLEVELAND**, a citizen of the United States, was the Director, Shareholder, and President/CEO of SCALPA, INC. **BRYCE CLEVELAND** controlled SCALPA, INC and its employees.

2. SCALPA, INC. was a for-profit corporation incorporated in Arizona on or about July 27, 2015. SCALPA, INC. marketed and sold medical devices intended to affect the structure and function of the human body, and it provided training on the use of those products to residents of the United States and persons abroad.

1

3.    **BRYCE CLEVELAND** and SCALPA, INC. partnered with affiliated companies that maintained payment and shipping operations in the United States.

4.    **BRYCE CLEVELAND** and SCALPA, INC. marketed its products online, as well as sent emails and placed and received telephone calls with consumers.

5.    **BRYCE CLEVELAND** and SCALPA, INC. caused Scalpa products to be shipped to the Western District of Virginia and elsewhere in the United States via interstate carriers. The packages contained medical devices and drug products purchased by consumers in the Western District of Virginia.

## *THE FEDERAL FOOD, DRUG, AND COSMETIC ACT*

6.    The United States Food and Drug Administration ("FDA") was the federal agency responsible for protecting the health and safety of the public by assuring, among other things, that drugs and medical devices intended for use in the treatment of humans were safe and effective for their intended uses. Pursuant to this statutory mandate, the FDA's responsibilities included regulating the approval and distribution of drugs and medical devices shipped, delivered, and received in interstate commerce.

7.    Under the federal Food, Drug and Cosmetic Act (Title 21, United States Code, §§ 301-397, the "FDCA"), and pursuant to Title 21, United States Code, § 321(h), the term "device" included an "instrument, apparatus, implement, machine . . . or other similar or related article . . . which is . . . intended to affect the structure or any function of the body of man . . . which does not achieve its primary intended purposes through chemical action within or on the body of man . . . and which is not dependent upon being metabolized for the achievement of its primary intended purposes."

8.    The FDCA required devices to meet certain requirements before they could be introduced into interstate commerce. The requirements differed depending on which of three classes—Class I, Class II, or Class III—a device fell into, with Class III devices subject to the

most stringent regulatory requirements. A device's classification was determined by the degree of regulatory control necessary to provide reasonable assurance of the device's safety and effectiveness when used as intended.

9. Devices that were not in commercial distribution prior to May 28, 1976, when the Medical Device Amendments to the FDCA became effective, were automatically assigned to Class III by operation of law. Class III devices could not legally be marketed in the United States until the manufacturer had submitted to the FDA a pre-market approval application and the FDA had approved that application. Pre-market approval generally required that, among other things, the manufacturer submit to FDA clinical trial data regarding the device's safety and efficacy. The FDA would not grant pre-market approval unless the information in the application provided the FDA with reasonable assurance that the device was safe and effective when used according to its proposed labeling.

10. A manufacturer could remove its device from Class III, and thus avoid the pre-market approval requirement, if the manufacturer obtained from FDA a finding that the device was substantially equivalent to a predicate device that was already legally marketed in the United States. 21 U.S.C. § 360(k). This process was referred to as "510(k) clearance."

11. Under the FDCA, and unless subject to an exemption not applicable here, every manufacturer of a new device was required to obtain pre-market approval or 510(k) clearance prior to introducing its device into interstate commerce.

12. Under the FDCA, a Class III device was deemed to be adulterated if it was required to have pre-market approval but did not have such approval. 21 U.S.C. § 351(f)(1)(B).

13. The FDCA prohibited the introduction or delivery for introduction into interstate commerce, or causing the introduction or delivery for introduction into interstate commerce, of any adulterated device. 21 U.S.C. § 331(a).

14. The FDCA defined the term "drug" as, among other things, an article intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, or an article (other than food) intended to affect the structure or any function of the human body. 21 U.S.C. § 321(g)(1).

15. The FDCA defined the term "new drug" as "any drug ... the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . . ." 21 U.S.C. § 321(p)(1).

16. The FDCA prohibited the introduction or delivery for introduction into interstate commerce of a new drug without an approved New Drug Application (NDA) or an approved Abbreviated New Drug Application (ANDA). 21 U.S.C. § 355(a).

17. The FDCA further prohibited the introduction or delivery for introduction into interstate commerce, or causing the introduction or delivery for introduction into interstate commerce, of any article in violation of 21 U.S.C. § 355. 21 U.S.C. § 331(d).

### *SCALPA PRODUCTS*

18. Between in or about 2018 through on or about December 2020, and **BRYCE CLEVELAND** and SCALPA, INC. introduced, delivered for introduction, and caused the introduction and delivery for introduction of the following products into interstate commerce:

   a. **Fibroblast Pen** (also known as the Scalpa Skinblast Machine and Plasma Pen), which was a device intended to discharge a high-frequency electric current to the skin and thereby improve one's appearance.

   b. **Hyaluron Pen** (also known as ScalpaJect and ScalpaJECT), which was a device intended to penetrate hyaluronic acid serums and cross-linked gels into the skin without the use of needles and thereby improve one's appearance.

4

c. **Hyaluronic Acid** (also known as HA, Hyaluronic Gel, Hyaluronic Acid Gel, and ScalpaJECT Hyaluronic Acid), which was a device intended to be used as a dermal filler and thereby improve one's appearance.

d. **Scalpatox**, which was a drug, containing Clostridium botulinum type A neurotoxin complex, intended to be injected into the human body to improve one's appearance.

19. Because **BRYCE CLEVELAND** intended for the Fibroblast Pen, Hyaluron Pen, and Hyaluronic Acid products to be used to affect the structure and function of the human body, and the products did not achieve their primary intended purposes through chemical action within or on the human body, the Fibroblast Pen, Hyaluron Pen, and Hyaluronic Acid products were "devices" within the meaning of the FDCA.

20. The Fibroblast Pen, Hyaluron Pen, and Hyaluronic Acid products had not been approved by the FDA for any use, and no pre-market approval or 510(k) clearance was in effect for the Fibroblast Pen, Hyaluron Pen, or Hyaluronic Acid products. The Fibroblast Pen, Hyaluron Pen, and Hyaluronic Acid products were Class III devices that had not been approved for use and had not received pre-market approval from the FDA.

21. Because **BRYCE CLEVELAND** intended for Scalpatox to be used to affect the structure and function of the human body, Scalpatox was a "drug" within the meaning of the FDCA.

22. Scalpatox had not been approved by the FDA for any use, and no approved NDA or ANDA was in effect for Scalpatox.

23. At no time relevant to this Indictment was SCALPA, INC. registered with the FDA as a distributor of drugs and devices within the United States.

5

## COUNTS 1-12
## Mail Fraud
## (18 U.S.C. § 1341)

24. The GENERAL ALLEGATIONS section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

25. On or about the dates specified below as to each count, in the Western District of Virginia and elsewhere, the defendant,

### BRYCE CLEVELAND

knowingly devised, and intended to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and, for the purpose of executing such scheme and artifice, knowingly caused to be delivered certain mail matter by the United States Postal Service and by a private and commercial interstate carrier, according to the directions thereon.

### *PURPOSE OF THE SCHEME AND ARTIFICE*

26. It was a purpose of the scheme for **BRYCE CLEVELAND** to unlawfully enrich himself by: (a) marketing, and causing others to market, unapproved devices, including but not limited to the Fibroblast Pen and Hyaluron Pen, to consumers while representing, and causing others to represent, that the unapproved devices were not regulated; (b) marketing, and causing others to market, unapproved devices, including but not limited to the Fibroblast Pen and Hyaluron Pen, to consumers while omitting and concealing, and causing others to omit and conceal, that the devices were regulated; and (c) thereafter keeping the sale proceeds of these devices for **BRYCE CLEVELAND's** personal use and benefit.

### *USE OF THE MAILS*

27. On or about the dates specified below, **BRYCE CLEVELAND**, for the purpose of executing and in furtherance of the aforesaid scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises,

6

did knowingly cause to be delivered by the United States Postal Service and by a private and commercial interstate carrier, according to the directions thereon, the items identified below:

| COUNT | ON OR ABOUT | DESCRIPTION OF MAILING |
|---|---|---|
| 1 | September 26, 2019 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 2 | November 12, 2019 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 3 | November 29, 2019 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 4 | November 30, 2019 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 5 | December 25, 2019 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 6 | January 1, 2020 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 7 | March 3, 2020 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 8 | March 7, 2020 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 9 | April 6, 2020 | Hyaluron Pen, shipped from Arizona to a location in the Western District of Virginia |
| 10 | April 15, 2020 | ScalpaJECT Hyaluronic Acid Gel, shipped from Arizona to a location in the Western District of Virginia |
| 11 | April 23, 2020 | Hyaluron Pen, shipped from Arizona to a location in the Western District of Virginia |
| 12 | September 13, 2020 | ScalpaJECT Hyaluronic Acid Gel, shipped from Arizona to a location in the Western District of Virginia |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS 13-21
## Wire Fraud
## (18 U.S.C. § 1343)

28. The GENERAL ALLEGATIONS section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

29. On or about the dates specified below as to each count, in the Western District of Virginia and elsewhere, the defendant,

**BRYCE CLEVELAND**

7

knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and, for the purpose of executing such scheme and artifice, did transmit and cause to be transmitted, by means of wire communication, in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds.

### *PURPOSE OF THE SCHEME AND ARTIFICE*

30. It was a purpose of the scheme for **BRYCE CLEVELAND** to unlawfully enrich himself by: (a) marketing, and causing others to market, unapproved devices, including but not limited to the Fibroblast Pen and Hyaluron Pen, to consumers while representing, and causing others to represent, that the unapproved devices were not regulated; (b) marketing, and causing others to market, unapproved devices, including but not limited to the Fibroblast Pen and Hyaluron Pen, to consumers while omitting and concealing, and causing others to omit and conceal, that the devices were regulated; and (c) thereafter keeping the sale proceeds of these devices for **BRYCE CLEVELAND**'s personal use and benefit.

### *USE OF THE WIRES*

31. On or about the dates specified as to each count below, the defendant, **BRYCE CLEVELAND**, for the purpose of executing and in furtherance of the aforesaid scheme and artifice, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, as set forth below:

| COUNT | ON OR ABOUT | DESCRIPTION OF WIRE |
|---|---|---|
| 13 | September 26, 2019 | Electronic communication between Scalpa, Inc. and a purchaser in the Western District of Virginia |
| 14 | November 29, 2019 | Electronic communication between Scalpa, Inc. and a purchaser in the Western District of Virginia |
| 15 | December 25, 2019 | Electronic communication between Scalpa, Inc. and a purchaser in the Western District of Virginia |
| 16 | January 1, 2020 | Electronic communication between Scalpa, Inc. and a purchaser in the Western District of Virginia |
| 17 | March 3, 2020 | Electronic communication between Scalpa, Inc. and a purchaser in the Western District of Virginia |
| 18 | March 7, 2020 | Electronic communication between Scalpa, Inc. and a purchaser in the Western District of Virginia |
| 19 | April 6, 2020 | Electronic communication between Scalpa, Inc. and a purchaser in the Western District of Virginia |
| 20 | April 15, 2020 | Electronic communication between Scalpa, Inc. and a purchaser in the Western District of Virginia |
| 21 | April 23, 2020 | Electronic communication between Scalpa, Inc. and a purchaser in the Western District of Virginia |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 22-33

**Introduction of Adulterated Devices into Interstate Commerce**
**(21 U.S.C. §§ 331(a), 351(f)(1)(B), 360c(f)(1), and 333(a)(2))**

32. The GENERAL ALLEGATIONS section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

33. On or about the dates listed below, **BRYCE CLEVELAND**, with the intent to defraud and mislead, in the Western District of Virginia and elsewhere, introduced and delivered for introduction into interstate commerce, and caused to be introduced and delivered for introduction into interstate commerce, from Arizona into the Western District of Virginia and elsewhere, adulterated devices, namely the Hyaluron Pen, ScalpaJect, and ScalpaJECT, that were Class III devices that had not received pre-market approval from the FDA.

| COUNT | ON OR ABOUT | INTRODUCTION INTO INTERSTATE COMMERCE |
|---|---|---|
| 22 | September 26, 2019 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 23 | November 12, 2019 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 24 | November 29, 2019 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 25 | November 30, 2019 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 26 | December 25, 2019 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 27 | January 1, 2020 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 28 | March 3, 2020 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 29 | March 7, 2020 | ScalpaJECT Hyaluronic Acid, shipped from Arizona to a location in the Western District of Virginia |
| 30 | April 6, 2020 | Hyaluron Pen, shipped from Arizona to a location in the Western District of Virginia |
| 31 | April 15, 2020 | ScalpaJECT Hyaluronic Acid Gel, shipped from Arizona to a location in the Western District of Virginia |
| 32 | April 23, 2020 | Hyaluron Pen, shipped from Arizona to a location in the Western District of Virginia |
| 33 | September 13, 2020 | ScalpaJECT Hyaluronic Acid Gel, shipped from Arizona to a location in the Western District of Virginia |

All in violation of 21 U.S.C. §§ 331(a), 351(f)(1)(B), 360c(f)(1), and 333(a)(2).

## COUNT 34
## Introduction of an Unapproved New Drug into Interstate Commerce
## (21 U.S.C. §§ 331(d), 355(a), and 333(a)(2))

34. The General Allegations are re-alleged and incorporated by reference.

35. On or about the dates listed below, in the Western District of Virginia and elsewhere, **BRYCE CLEVELAND** with the intent to defraud and mislead, introduced and delivered for introduction into interstate commerce, and caused to be introduced and delivered for introduction into interstate commerce, from Arizona into the Western District of Virginia and elsewhere, "Scalpatox," a new drug within the meaning of Title 21, United States Code, Section 321(p) that did not have in effect an approval of an application filed pursuant to Title 21, United States Code, Section 355(a).

| COUNT | ON OR ABOUT | INTRODUCTION INTO COMMERCE |
|---|---|---|
| 34 | August 4, 2020 | ScalpaTOX, shipped from Arizona to a location in the Western District of Virginia |

All in violation of 21 U.S.C. §§ 331(d), 355(a), and 333(a)(2).

# FIRST FORFEITURE ALLEGATION

**Criminal Forfeiture -18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853; 28 U.S.C. § 2461**

36. The allegations of this Indictment are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **BRYCE CLEVELAND,** has an interest.

37. Upon conviction of a violation of Title 18, United States Code, Sections 1341 and 1343, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes, or is derived from, proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

38. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

39. All pursuant to 18 U.S.C. § 981(a)(1)(C), and the procedures set forth at 21 U.S.C. § 853, as incorporated by 28 U.S.C. § 2461.

## SECOND FORFEITURE ALLEGATION

### Criminal Forfeiture - 21 U.S.C. § 334 and 28 U.S.C. § 2461(c)

40. The allegations contained in this Indictment are hereby incorporated and realleged by reference for the purpose of alleging forfeiture pursuant to Title 21, United States Code, Section 334; and Title 28, United States Code, Section 2461(c).

41. Upon conviction of a violation of Title 21, United States Code, Section 334 and Title 28, United States Code. Section 2461 (c), of any property introduced into interstate commerce in violation of Sections 331 and 333, or the value thereof.

42. The United States also intends to seek a forfeiture money judgment, in an amount to be determined at or prior to sentencing, representing the total value of any property involved in such offenses.

43. If by any act or omission of defendant, any of the property subject to forfeiture described above:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to. or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been comingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 246l(c), to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

A TRUE BILL this 24th day of July, 2024

/s/ Foreperson

*Christopher R. Kavanaugh/FL*
CHRISTOPHER R. KAVANAUGH
UNITED STATES ATTORNEY
WESTERN DISTRICT OF VIRGINIA

AMANDA LISKAMM
DIRECTOR
U. S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH

*Speare I. Hodges*
SPEARE I. HODGES
TRIAL ATTORNEY
U.S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH